# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

NYJEE BOYD,

                                        Plaintiff,

                                                                9:18-CV-1333
            v.                                                  (TJM/ATB)

JOHN DOE #1, et. al.

                                        Defendants.

NYJEE BOYD, Plaintiff, pro se
KASEY K. HILDONEN, Asst. Attorney General, for the Moving Defendants

ANDREW T. BAXTER
United States Magistrate Judge

## REPORT-RECOMMENDATION

        This matter has been referred to me for Report and Recommendation by the

Honorable Thomas J. McAvoy, United States Senior District Judge.  On November 13,

2018, plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983 against

various named and unnamed individuals employed by the New York State Department

of Corrections and Community Supervision ("DOCCS").  (Complaint ("Compl.") (Dkt.

No. 1).  By decision and order dated January 2, 2019, Judge McAvoy dismissed several

defendants and causes of action pursuant to 28 U.S.C. §§ 1915, 1915A.  (Dkt. No. 6.)

Plaintiff subsequently filed an amended complaint ("AC") (Dkt. No. 18), which was

reviewed and accepted, in part, for filing by Judge McAvoy. (Dkt. Nos. 22, 23).  Not

long after, plaintiff filed another motion to amend. (Dkt. No. 37).  Judge McAvoy

accepted plaintiff's second amended complaint ("SAC") for filing subsequent to his

initial review.  (Dkt. No. 41, 42).

        Liberally construed, the surviving claims in the SAC include plaintiff's (1) First

Amendment free exercise claims against defendants C.O. John Doe #2, C.O. John Doe #3, Sergeant ("Sgt.") John Doe #1, Wood,[1] Dubrey, Annucci, and Bell; (2) First Amendment retaliation claims against defendants C.O. John Doe #2, Baer, C.O. John Doe #3, Wood, Hunt, Young, Holland, Sgt. John Doe #1, Dubrey, Annucci, Bell, Mahan, and John Doe #8; (3) Eighth Amendment excessive force and failure-to-intervene claims against defendants Baer and C.O. John Doe #7 based on the alleged events that occurred on March 29, 2018; (4) Eighth Amendment excessive force and failure-to-intervene claims against defendants Hunt, C.O. John Doe #3, Bell, and Annucci based on the alleged events that occurred on April 6, 2018; (5) Eighth Amendment excessive force claims against defendants Baer, Bell, and Annucci based on the alleged events that occurred on April 17, 2018; and (6) Eighth Amendment excessive force and failure to intervene claims against defendants Sgt. John Doe #1, Sgt. John Doe #2, C.O. John Doe #1, C.O. John Doe #6, Annucci, and Bell based on the alleged events that occurred on April 22, 2018. (Dkt. No. 41 at 31–32).

On May 25, 2021, defendants Mahan, Hunt, Baer, Young, Dubrey, Bell, Annucci, Holland, and Wood filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56.  (Dkt. No. 88).  The moving defendants seek dismissal of the SAC based primarily on plaintiff's purported failure to exhaust his administrative remedies.[2]

---

[1] Although not explicitly discussed in Judge McAvoy's most recent order on initial review (Dkt. No. 41), it appears that plaintiff's surviving claims against defendant C.O. Wood are based on the alleged events that occurred on April 6, 2018 and April 26, 2018, and not on the events alleged to have occurred on May 1, 2018.  (*See* SAC at 10-13).

[2] Defendants also seek dismissal of some causes of action based on a the merits of those claims, as further discussed below.

(Defendants' Memorandum of Law ("Def.'s MOL") at 5-12) (Dkt. No. 88-7).  In the alternative, the moving defendants request an evidentiary hearing to assess whether plaintiff exhausted his administrative remedies.  (*Id.* at 1).  Plaintiff responded in opposition to the summary judgment motion. (Plaintiff's Memorandum of Law in Opposition ("Pl.'s MOL ")) (Dkt. No. 100).

On November 8, 2021, while the moving defendants' summary judgment motion was pending consideration by the court, plaintiff filed a motion to amend his second amended complaint.  (Dkt. No. 104).  Defendants have not responded to plaintiff's motion to amend, despite being afforded an opportunity to do so.

Currently pending before this court is the moving defendants' motion for summary judgment.  (Dkt. No. 88).  In the interest of judicial efficiency, the court will also address plaintiff's motion to amend in this report-recommendation.[3]   For the following reasons, I recommend that the district court grant the moving defendants' motion for summary judgment in part, and deny the motion in part.  I also recommend that plaintiff's motion to amend his second amended complaint be denied for failure to show good cause under Fed. R. Civ. P. 16(b), among other reasons.  Finally, I recommend that the district court sua sponte dismiss the Doe defendants from this action for failure to prosecute, pursuant to Fed. R. Civ. P. 41(b).

---

[3]Typically, a motion to amend a pleading is non-dispositive in nature, and can be decided directly by the magistrate judge. *See Fielding v. Tollaksen*, 510 F.3d 175, 178 (2d Cir. 2007). However, because plaintiff's motion to amend is so intertwined with the moving defendants' motion for summary judgment, we will make recommendations to the district court on both motions.

## I.    **Summary Judgment – Legal Standards**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## II.    **Facts and Contentions**

Plaintiff was an inmate housed at Clinton Correctional Facility ("Clinton C.F.") at all times relevant to this action.  The underlying facts as stated by plaintiff have been analyzed piecemeal in the prior decision and orders relative to plaintiff's complaint, amended complaint, and second amended complaint. (Dkt. Nos. 6 at 4–10; 22 at 3–6; 41 at 6–10).  Plaintiff also attached various document exhibits to his second amended complaint, in further support of the claims contained therein.  (*See* Dkt. No. 42-1).

In support of their motion, the moving defendants have filed many exhibits, including DOCCS records, declarations from non-party witnesses, and plaintiff's deposition transcript. (*See* Dkt. Nos. 88-1; 88-2; 88-3; 88-4; 88-5).  These submissions are generally limited to matters concerning administrative exhaustion.  The statement of material facts submitted by the moving defendants is also limited to the issue of administrative exhaustion.  (Dkt. No. 88-6).  Accordingly, the following facts underlying plaintiff's surviving, substantive causes of action are taken primarily from plaintiff's second amended complaint and his deposition transcript.  They are generally assumed undisputed for purposes of the moving defendants' motion.

### A.    **March 29, 2018 – C.O. Baer and C.O. Doe #7**

On March 29, 2018, at approximately 2:30 p.m., plaintiff was returning to his housing unit from a law library call-out.  (SAC at 8). Plaintiff and another inmate were stopped and instructed by defendant C.O. Doe #7 to wait on "two company." (*Id*). Plaintiff waited for approximately fifteen to thirty minutes before he was directed to return to "four company," where he was housed.  (*Id.*).  At that time, plaintiff "asked

5

[C.O. Doe #7] to be placed on the rec list for chow and gym." (*Id.*).  C.O. Doe #7 responded, "you had a [sic] opportunity to do that when you first came back.  Get the fuck away from my desk and go lock-in." (SAC at 8).  Plaintiff attempted to explain why he did not make this request earlier, but defendant C.O. Baer, who was standing nearby, stated, "your [sic] still fucking running your mouth [sic] get on the fucking wall." (SAC at 8).  Plaintiff complied.  (*Id.*).  C.O. Baer then stated, "You don't question [our] staff [sic] if you move off the wall I will break your neck." (*Id.*).  C.O. Baer proceeded to search plaintiff, while C.O. Doe #7 observed.  (*Id.*).  During the search, C.O. Baer "stuck his hand in [plaintiff's] boxers and grabbed and pulled [his] testicles causing [plaintiff] severe pain."  (*Id.*).  C.O. Baer also performed a "credit card swipe" between plaintiff's buttocks.  (Plaintiff's Deposition Transcript ("Pl.'s Dep.")[4] at 14).  After approximately ten seconds, C.O. Baer stated, "you do what we tell you nigger [sic] take it back to your cell." (SAC at 8).

Later that day, plaintiff wrote a letter to defendant Anthony Annucci, describing the aforementioned incident.  (*Id.*).  Plaintiff eventually received a response from the Inspector General, advising that his complaint was being referred "to executive management at the NYS DOCCS OSI." (*Id.*).  Plaintiff was visited by a representative from OSI on or about April 16, 2018.  (*Id.*).  The OSI representative advised plaintiff that nothing more could be done, and cautioned plaintiff that he would probably experience more retaliation because the correctional officers involved would be notified of plaintiff's complaint.  (*Id.*).

---

[4]Plaintiff's deposition transcript is attached as Exhibit A to the sworn declaration of assistant attorney general Kasey Hildonen.  (*See* Dkt. No. 88-5).

**B.    April 6, 2018 – C.O. Wood, C.O. Doe #2, C.O. Doe #3, C.O. Hunt**

On April 6, 2018 at approximately 8 a.m., plaintiff was returning from breakfast when defendant C.O. Doe #3 asked him, "Do you still have those braids in your hair?" (*Id.* at 10). Plaintiff responded, "As you can see I have a crown on and my hair is in compliance with Directive 4914 . . . and my braids do not extend beyond the hairline." (*Id.*). C.O. Doe #3 responded, "It doesn't matter if its not below the hairline [sic] the end of your braids can't be tied together [sic] you have to tie them individually." (*Id.*). Plaintiff told C.O. Doe #3 that he had misinterpreted the directive. (*Id.*). C.O. Doe #3 then told plaintiff that "every time he sees [plaintiff] with [his] crown on [C.O. Doe #3 was] going to deny [plaintiff] chow and rec." (*Id.*).

At approximately 11:15 a.m., plaintiff "advised" defendant C.O. Wood to place him on the "chow list." (*Id.*). C.O. Wood responded that, according to his list, he was not to let plaintiff out of his cell because plaintiff had "misinterpreted the directive." (*Id.*). Plaintiff was denied chow and rec. (*Id.*).

At approximately 12:45 p.m., plaintiff was escorted from his cell to a law library call-out by C.O. Doe #3. (*Id.* at 18). As they approached the metal detector, C.O. Doe #3 engaged in a conversation with defendant C.O. Hunt, the "frisker officer." (*Id.*). As plaintiff walked through the metal detector, he was directed by C.O. Hunt to place his hands on the wall. (*Id.*). C.O. Hunt proceeded to pat-frisk plaintiff, while C.O. Doe #3 observed. (*Id.*). During the pat-frisk, C.O. Hunt "grabbed [plaintiff's] buttocks with both hands and pressed his body closer to [plaintiff]," stating, "If you haven't noticed we do what we want here." (*Id.*). C.O. Doe #3 was "smirking," and did not attempt to

7

stop C.O. Hunt.  (*Id.*).  Plaintiff then proceeded to his law library call-out.  (*Id.*).

At 2:30 p.m., plaintiff was returning from the law library call-out when defendant C.O. Doe #2 told plaintiff to place his hands on the wall.  (*Id.* at 10).  Plaintiff complied, and C.O. Doe #2 began to pat-frisk him.  (*Id.*).  C.O. Doe #2 then told plaintiff to take off his crown.  (*Id.*).  When plaintiff took off his crown, C.O. Doe #2 "snatched" it out of plaintiff's hand and threw it on the floor.  (*Id.*).  C.O. Doe #2 stated, "We don't care about your religion [sic] don't wear that crown or we'll go through this every day."  (*Id.*).

### C.    April 7 & 16, 2018– C.O. Doe #2

At approximately 3:00 p.m. on April 7, 2018, plaintiff was "proceeding to rec" when C.O. Doe #2 told him to take off his crown, or he "wasn't going to rec."  (*Id.*).  Plaintiff refused to take off his crown, and was denied recreation time.  (*Id.*).

At approximately 2:30 p.m. on April 16, 2018, plaintiff was returning from the law library when C.O. Doe #2 told him to place his hands on the wall.  (*Id.* at 11).  Plaintiff complied, was pat-frisked, and his "legal materials were thrown on the floor and C.O. Doe #2 snatched off [plaintiff's] crown and threw it on the floor."  (*Id.*).  C.O. Doe #2 stated, "I told you not to wear that crown anymore [sic] we'll go through this every time I see you with it on."  (*Id.*).  C.O. Doe #2 then "threatened" plaintiff, stating that "he and his officers are going to set [plaintiff] up because they see [plaintiff doesn't] get the picture."  (*Id.*).

### D.    April 17, 2018 – C.O. Baer, C.O. Young

On April 17, 2018, at approximately 9:55 a.m., plaintiff was returning to his

8

housing unit from a legal phone call. (*Id.* at 16). Upon observing plaintiff, C.O. Baer stated, "I see you like to file complaints [sic] get on the wall." (*Id.*). As C.O. Baer was pat-frisking plaintiff, he "intentionally rammed his arm into [plaintiff's] testicles, causing [him] severe pain." (*Id.*). C.O. Baer then stated, "We'll go through this every time and I'll make sure you don't go to chow or rec every chance I get [sic] keep writing complaints." (*Id.*).

On April 17, 2018, plaintiff was also twice denied "chow and rec" by defendant C.O. Young, who stated, "Keep filing complaints on me and my officers because anytime I work you won't be going to chow or rec." (*Id.* at 11).

### E.    April 22, 2018 – Sgt. Doe #1, Sgt. Doe #2, C.O. Doe #1, C.O. Doe #6

On April 22, 2018 at approximately 7:00 p.m., plaintiff attended a disciplinary hearing for a Tier I misbehavior report. (*Id.* at 17). At the hearing, defendant Sgt. Doe #1 advised plaintiff that he had been issued a misbehavior report on April 17, 2018 regarding his hair. (*Id.*). Then, Sgt. Doe. #1 "demanded [plaintiff] take his religious crown off." Plaintiff refused to remove his crown, and Sgt. Doe #1 "punched [plaintiff] in the face twice." (*Id.*). Then, defendants Sgt. Doe #2, C.O. Doe #1 and C.O. Doe #6 "rushed in the room[,] grabbed plaintiff and placed him in a choke hold. (*Id.*). Sgt. Doe #1 then punched plaintiff in the stomach, stating, "You fucking nigger! Keep writing complaints [sic] we will kill your black ass at tax payer [sic] expense." (*Id.*). The defendants eventually released plaintiff and directed him to his cell, stating,[5] "If you move the wrong way we will kill your black ass." (*Id.*).

_____

[5]The SAC does not specify which individual made this statement.

## F.    April 26, 2018 – C.O. Doe #3, C.O. Wood, Sgt. Holland

At 11:20 a.m. on April 26, 2018, plaintiff went to the visiting room for a FOIL[6] review.  (*Id.* at 11).  When he returned to his housing unit, he informed defendant C.O. Doe #3 that he did not eat because he was at the FOIL review.  (*Id.*).  C.O. Doe #3 responded, "You should've thought about that before writing complaints against my staff."  (*Id.*).  Plaintiff was then directed to "lock in."  (*Id.*).  Plaintiff got to his cell and advised defendant C.O. Wood, who was opening his cell, the he did not eat.  (*Id.*).  C.O. Wood stated, "Yea I know keep doing more in house shit your [sic] going to miss a lot more meals."  (*Id.*).  At that time, plaintiff "requested to speak with mental health." (*Id.*).  Plaintiff was placed in his cell, and twenty minutes later C.O. Wood returned with defendant Sgt. Holland.  (*Id.*).  Plaintiff was escorted to mental health, where he was placed in a room in mechanical restraints.  (*Id.*).  When plaintiff's mental health counselor arrived, plaintiff stated that he did not want to be interviewed in the presence of "staff members," and that he wanted to sign into protective custody because the correctional staff had been denying him meals and retaliating against him.  (*Id.* at 11-12). The mental health counselor asked Sgt. Holland if he would permit plaintiff to sign into protective custody, to which Sgt. Holland responded, "Hell no, I'm not giving this punk motherfucker PC."  (*Id.* at 12).  Sgt. Holland then made the mental health counselor leave, and began threatening plaintiff, stating, "If this was back in the days me and my officers would've took [sic] you to the back and beat the shit out you [sic]. But since you want to be a pussy and write staff up we will keep giving you as many

---

[6]New York's Freedom of Information Law ("FOIL"), which, among other things, grants the public access to certain government records.

tickets as we can until we eventually forget about you." (*Id.*).  Plaintiff was then escorted back to his cell and issued a misbehavior report, which was "later dismissed due to the mental health [counselor] crediting [plaintiff's] version of events." (*Id.*).

### G.    July 18, 2018 – C.O. Dubrey, C.O. Baer

On July 18, 2018 at approximately 7:45 p.m., plaintiff was proceeding through a metal detector on his way to the gym when defendant C.O. Dubrey stated to him, "Why I [sic] have a feeling you have an illegal hairstyle under that crown[?]" (*Id.*).  As plaintiff continued walking, C.O. Dubrey told plaintiff to take off his crown.  (*Id.*). Plaintiff refused.  (*Id.*).  C.O. Dubrey directed plaintiff to place his hands behind his back, then placed plaintiff in mechanical restraints.  (*Id.*).  C.O. Dubrey escorted plaintiff back to his block, stating, "I know you just got off of loss of rec [sic] I know all about you. [You're] nothing but black trash from the hood [sic] you like to write my staff up.  We're going to set your black ass up anytime I work and if I see you with that crown on I'm taking you back to your cell [sic] I don't care if it's in the mess hall." (*Id.*).  Defendant C.O. Baer then approached plaintiff and stated, "Well look who we have here the motherfucker who likes to write complaints.  You know eventually we're going to get you back [sic] we always win." (*Id.*).  As C.O. Dubrey placed plaintiff in his cell, he stated, "You don't run shit [sic] we run this shit and write me up I dare you." (*Id.*).  Plaintiff was issued "a false misbehavior report" as a result of this incident.  (*Id.*).

11

### H.    August 5, 2018 - C.O. Baer

On August 5, 2018 at approximately 7:15 a.m., plaintiff asked C.O. Hill[7] to place him on the list for "chow." (*Id.* at 15). C.O. Hill informed plaintiff that he was still on keeplock status. (*Id.*). Plaintiff showed C.O. Hill his hearing disposition paper, presumably disputing this fact. (*Id.*). C.O. Hill "then walked off." (*Id.*). Approximately an hour later, defendant C.O. Baer approached plaintiff's cell and stated, "You're dead with me and my staff [sic] and keep writing your complaints because this time [I will] really make you suck my dick." (*Id.*). Later that night C.O. Baer issued plaintiff "a false misbehavior report." (*Id.*).

### I.    DOCCS Commissioner Anthony Annucci

In March and April of 2018, plaintiff wrote several letters to defendant Commissioner Anthony Annucci describing the assaults and retaliation he had been subjected to by Clinton C.F. staff. (*Id.* at 19). On April 20, 2018, plaintiff received a letter from non-party Stephen J. Maher of the Office of Special Investigations, stating that defendant Annucci had "asked [Maher] to respond to [plaintiff's] letter alleging sexual harassment at Clinton Correctional Facility." (*Id.* at 19; SAC Ex. A at 2). The letter further stated that Maher's office had received plaintiff's complaint and was "investigating the allegation." (SAC Ex. A at 2). Plaintiff alleges that despite these communications, he was "never relocated, which led to . . . additional sexual and physical abuses" against him. (SAC at 19).

---

[7]C.O. Hill was dismissed as a defendant from this case pursuant to Judge McAvoy's order on initial review. (Dkt. No. 22 at 17).

### J.    Clinton C.F. Superintendent Eric Bell

Plaintiff also wrote several letters to defendant Superintendent Eric Bell between April and August of 2018, complaining of assaults and retaliation he had been subjected to by Clinton C.F. staff.  (SAC at 21).  In response to these letters, plaintiff received several memoranda from Superintendent Bell indicating that his grievances were being referred to a "DSS Zerniak."  (*Id.*; SAC Ex. A at 28–35).  Plaintiff alleges that no investigation was actually conducted into his complaints.  (SAC at 21).

### K.    March 4, 2019 – C.O. Mahan, C.O. Doe #8

On March 4, 2019 at approximately 7 a.m., C.O. Doe #8 was escorting the medical nurse on her rounds in plaintiff's housing unit.  (SAC at 22).  As defendant C.O. Doe #8 walked by plaintiff's cell, he stated, "I know all about your bullshit lawsuit, since you like to file lawsuits, we're going to set you up."  (*Id.*).  At approximately 10:05 a.m., defendants C.O. Mahan and C.O. Doe #8 opened plaintiff's cell and ordered him to get dressed for a mandatory medical call-out.  (*Id.*).  Plaintiff got dressed, and was placed in mechanical restraints.  (*Id.*).  C.O Mahan and C.O. Doe #8 escorted plaintiff to the "slop sink,"[8] while Sgt. Burgess[9] stood watching.  (*Id.*).  C.O. Doe #8 informed plaintiff that they were going to search his cell."  (*Id.*).  After securing plaintiff in the slop sink, C.O. Doe #8 and C.O. Mahan searched plaintiff's cell.  (*Id.*).  After approximately one hour, C.O. Doe #8 and C.O. Mahan returned

---

[8]According to plaintiff, the "slop sink" was the last cell at the end of his company, where cleaning supplies were stored.  (*Id.* at 22).

[9]Sgt. Burgess was dismissed as a defendant from this case pursuant to Judge McAvoy's order on initial review.  (Dkt. No. 41 at 17–18).

plaintiff to his cell.  (*Id.*).  At that time, plaintiff "discovered several . . . legal documents were destroyed [sic] as well as . . . pictures[.]"  (*Id.*).  Plaintiff was also issued a false misbehavior report by C.O. Mahan and C.O. Doe #8 for charges stemming from the cell search, including "altered item," "alcohol," and "contraband." (*Id.* at 22-23).

## III.  <u>Exhaustion of Administrative Remedies</u>

### A.    **Legal Standards**

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings.  *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).  As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements.  *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in

accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id*. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id*. § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id*. § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id*. § 701.8.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether

"special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1857 (June 6, 2016). "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. Sept. 1, 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still relevant. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, __ U.S. at __, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 656 F. App'x at 580. An administrative procedure is "unavailable" when

> (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross*, __ U.S. at __, 136 S. Ct. at 1859-60.

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Id*. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any"

16

relief. *Id.* at 1859.  The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.*  Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

### B.    Analysis

Defendants argue that summary judgment is warranted because plaintiff filed suit before obtaining a decision from CORC on the grievances relative to his federal claims, thereby failing to exhaust his administrative remedies.  (Def.'s MOL at 5–12).  Plaintiff maintains a host of surviving claims in his second amended complaint, and the parties apparently agree that the fifteen grievances identified in the pending motion are those relevant to plaintiff's claims against the moving defendants.  (*See* Def.'s MOL at 10; Pl.'s MOL at 5–6).

Defendant's argument seeking dismissal based on plaintiff's failure to wait for a response from CORC is subject to recent case law from the Second Circuit, which the defendants do not recognize in their motion papers.  Until very recently, district courts in this circuit were admittedly divided as to whether, and when, "delay by the CORC in issuing a timely decision to a prisoner's grievance renders exhaustion unavailable" as defined by the Supreme Court and the Second Circuit. *Bowie v. Woodruff*, No. 18-CV-00266, 2019 WL 5445519, at *1 (N.D.N.Y. Oct. 23, 2019) (collecting cases).  However, the Second Circuit has now definitively resolved this question, holding unequivocally that:

> [B]ecause the DOCCS Inmate Grievance Procedure imposes a
> mandatory deadline for the CORC to respond, an inmate exhausts
> administrative remedies when he follows the procedure in its
> entirety but the CORC fails to respond within the 30 days it is
> allocated under the regulations. We decline to impose a
> "reasonableness" requirement found nowhere in the text, which
> would leave inmates—and courts—to blindly speculate how long
> one must wait before filing suit.

*Hayes v. Dahlke*, 976 F.3d 259, 270 (2d Cir. 2020).  Accordingly, where the evidence

in this case reflects that plaintiff waited the requisite 30 days for a response from

CORC before filing suit, those claims are exhausted pursuant to *Hayes*.  However, as

the Second Circuit also held in *Hayes*, insofar as the plaintiff there "waited only 26

days after the CORC received the appeal of his grievance against the superintendent,

four days short of the 30-day deadline for the CORC to respond[,]" the plaintiff failed

to exhaust his administrative remedies with respect his claims.  *Id.* at 271 (citing 7

N.Y.C.R.R. § 701.5 (d)(3)(ii)).  Thus, if plaintiff here filed suit before the 30-day

deadline expired on any of his grievances, dismissal is warranted.

Of course, the question which precedes that posed by *Hayes* is whether plaintiff

filed a relevant grievance in the first place, "provid[ing] enough information about the

conduct of which [he] complain[ed] to allow prison officials to take appropriate

responsive measures." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004); *see also*

*Murray v. Gillani,* No. 12-CV-0401, 2013 WL 838351, at *7 (N.D.N.Y. Feb. 11, 2013)

("While the PLRA does not require a legal theory of liability to be set forth in an

inmate's grievance . . . the alleged misconduct must . . . be described adequately.").

With these criterion in mind, the court assesses, below, whether plaintiff sufficiently

exhausted his administrative remedies.

### 1. Claims Plaintiff Failed to Grieve

In their motion for summary judgment, the moving defendants have submitted fifteen grievances identified by non-party witnesses Rachael Seguin[10] and Christine Gregory[11] as potentially relevant to the underlying allegations in plaintiff's complaint. (Seguin Decl. ¶¶ 11–48, Exs. B–Q; Gregory Decl. ¶¶ 10–48; Exs. A–O).  Based on this evidence, several of plaintiff's claims against the moving defendants are subject to dismissal for failure to submit a grievance in the first place.  Specifically, there is no evidence before the court showing that plaintiff filed a grievance concerning his claims against (1) defendants C.O. Dubrey and C.O. Baer, based on the alleged events that occurred on July 18, 2018; (2) defendant C.O. Baer, based on the alleged events that occurred on August 5, 2018, and (3) defendant C.O. Mahan, based on the alleged events that occurred on March 4, 2019.  (*See id.*).

In response to the moving defendants' motion, plaintiff does not argue that his ability to file an initial grievance with respect to these specific claims was thwarted, obstructed, or otherwise unavailable.  Moreover, plaintiff has conceded that the grievances identified by the moving defendants are those relevant to his underlying claims.  (Pl.'s MOL at 5–6).

The court notes that plaintiff filed Grievance No. 74906-18 on December 3,

---

[10]Ms. Seguin is the Assistant Director of the Inmate Grievance Program ("IGP") for DOCCS. (Declaration of Rachael Seguin ("Seguin Decl.") ¶ 1).

[11]Ms. Gregory is the IGP Supervisor at Clinton C.F. (Declaration of Christine Gregory ("Gregory Decl.") ¶ 1).

2018, complaining that many of his grievances had not been processed or returned to him with identification numbers.  (Seguin Decl. Ex. P).  When plaintiff filed Grievance No. 74906-18, he identified, and in some cases attached copies of, the grievances he alleged were not processed.  Notably, none of the above referenced claims were identified in Grievance No. 74906-18 as missing grievances, nor were copies of grievances concerning these incidents produced by plaintiff.[12]

Accordingly, the court concludes that plaintiff made no effort to file any grievances regarding the aforementioned claims, and summary judgment is warranted based on plaintiff's failure to exhaust his administrative remedies.  *See Miller v. Annucci*, No. 17-CV-4698, 2021 WL 4392305, at *14 (S.D.N.Y. Sept. 24, 2021) ("Because there is no evidence that plaintiff even attempted to file a grievance, the exception . . . for grievances processes that provide no guidance on what to do when a grievance is submitted but not filed . . . does not apply."); *Grafton v. Hesse*, No. 15-CV-4790, 2017 WL 9487092, at *9 (E.D.N.Y. Aug. 25, 2017) ("[U]nlike the prisoner . . . who attempted to file a grievance, [the plaintiff here] made no effort to file any grievances regarding the claims at issue"), *report and recommendation adopted*, 2017 WL 4286266 (E.D.N.Y. Sept. 27, 2017), *aff'd*, 783 F. App'x 29 (2d Cir. 2019).

### 2.    Claims Plaintiff Failed to Wait 30-Day Period for CORC Response

Plaintiff alleges that defendants C.O. Wood and C.O. Holland violated his constitutional rights during an incident that occurred on April 26, 2018.  (SAC at

---

[12]Plaintiff did complain in Grievance No. 74906-18 that *other* claims currently pending before this court were never filed or processed, as further discussed below.

11–12).  DOCCS's records indicate that plaintiff filed Grievance No. 73606-18 on May 9, 2018, complaining about the same incident.  (Seguin Decl. Ex. D at 70–71).[13]  The superintendent responded to plaintiff's grievance on October 25, 2018, and determined that there was no evidence of any malfeasance on the part of staff.  (Seguin Decl. ¶ 19, Ex. D at 72).  Plaintiff appealed the superintendent's determination to CORC, which appeal was stamped as received by the IGRC clerk on November 19, 2018 and by CORC on December 18, 2018.  (Seguin Decl. ¶ 20, Ex. D at 72).  CORC responded to plaintiff's appeal on January 8, 2020, unanimously accepting plaintiff's grievance action requested in part.  (Seguin Decl. ¶ 21, Ex. D at 67).

Plaintiff filed the original complaint in his pending federal action on November 13, 2018, which included the subject claim against defendants C.O. Wood and C.O. Holland.  (*See* Dkt. No. 1 at 11–12).  As of that date, plaintiff's appeal to CORC had yet to even be marked as filed by the IGRC clerk.  Thus, by all accounts, plaintiff failed to wait the requisite 30-day period for CORC to respond before bringing suit in federal court.  *See* NYCRR tit. 7 § 701.5(d)(3)(ii). Although the *Hayes* court made clear that a plaintiff "need not wait indefinitely after the agency fails to follow its own deadline at the final stage of appeal, he must actually wait for that deadline to expire before filing suit." 976 F.3d at 271.  Moreover, the fact that plaintiff did not actually receive a response from CORC for over a year is immaterial, because "[t]o hold otherwise would be in direct conflict with the Supreme Court's holding that 'proper exhaustion of administrative remedies . . . means using all steps that the agency holds out, and doing

---

[13]Exhibit pages are referred to by CM/ECF pagination.

so properly.'"  (*Id.*) (citing *Woodford*, 548 U.S. at 90); *see also Scott v. Uhler*, No. 16-CV-403, 2019 WL 5197139, at *5 (N.D.N.Y. July 31, 2019) ("Receiving a decision from CORC after filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted before filing suit, and any such action must be dismissed without prejudice").

Accordingly, summary judgment is warranted on plaintiff's claims against C.O. Wood and C.O. Holland stemming from the events occurring on April 26, 2018, because plaintiff failed to exhaust his administrative remedies.

### 3.    Plaintiff's Sexual Assault Claims

### a.    March 29, 2018 - C.O. Baer

Plaintiff alleges that defendant C.O. Baer violated his constitutional rights on March 29, 2018 when C.O. Baer sexually assaulted plaintiff during a pat-down search. (SAC at 8–9).  On December 3, 2018, plaintiff filed Grievance No. 74887-18, alleging that C.O. Baer had sexually assaulted him and that plaintiff's complaint[14] initially reporting the sexual assault was not being investigated properly.  (Seguin Decl. ¶ 58, Ex. N at 245–46).  The superintendent responded to Grievance No. 74887-18 on December 17, 2018, determining that plaintiff's allegations were reported and processed in accordance with the appropriate policies and procedures.  (Seguin Decl. ¶ 59, Ex. N at 248).  Plaintiff appealed the superintendent's determination to CORC on

---

[14]Although the records pertaining to plaintiff's original grievance/complaint regarding this sexual assault are not included in the evidence currently before this court, DOCCS records reflect that plaintiff filed a grievance on April 11, 2018, titled "PREA-Sexual Assault/Pain in Testicles."  (Seguin Decl. Ex. P at 275).  It does not appear that this grievance was appealed to the CORC level.  (Seguin Decl. Ex. B).

December 22, 2018. (Seguin Decl. ¶ 60, Ex. N at 248). The appeal was received by the

IGRC on January 8, 2019, and by CORC on January 17, 2019. (*Id.*). CORC responded

to plaintiff's appeal on February 5, 2020, upholding the superintendent's determination.

(Seguin Decl. ¶ 61).

     The exhaustion requirement for allegations concerning incidents of sexual assault

is different than that for other types of complaints. With respect to sexual abuse and

sexual harassment complaints, DOCCS Directive 4040 provides:

> The department has zero tolerance for sexual abuse and sexual harassment. Consistent with this policy and the Prison Rape Elimination Act (PREA) Standards (28 C.F.R. § 115.52(a)), an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the [PLRA] exhaustion requirement (42 U.S.C. § 1997e(a)) before bringing a lawsuit regarding an allegation of sexual abuse as long as the matter was reported as set forth below.

7 N.Y.C.R.R. § 701.3(i). For purposes of the PREA and the exhaustion requirement,

any allegation concerning an incident of sexual abuse or harassment shall be deemed

exhausted if official documentation confirms that:

> (1) an inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office Staff; to any outside agency that the Department has identified as having agreed to receive and immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards (28 C.F.R. § 115.51(b)); or to the Department's Office of the Inspector General; or (2) a third party reported that an inmate is the victim of sexual abuse and the alleged victim confirmed the allegation upon investigation.

*Id.*

Alternatively, DOCCS provides that a grievance alleging sexual abuse or harassment may be submitted at any time. *Id.* If an inmate files a formal grievance alleging sexual abuse or harassment with the grievance clerk, it shall immediately be reported by the IGP supervisor to the watch commander, and that complaint "shall be deemed exhausted upon filing for PLRA purposes." *Id.*

In this instance, plaintiff sufficiently exhausted his administrative remedies with respect to his sexual assault claim against C.O. Baer.  Fist, the evidence suggest that plaintiff did file in initial grievance regarding the underlying sexual assault with the IGRC.  (Seguin Decl. Ex. P at 275).  According to DOCCS own directives, this grievance need not have been appealed to the CORC level, and should have been deemed exhausted upon filing.  Moreover, various documents submitted by the moving defendants relative to Grievance No. 74887-18 state that plaintiff's original allegation of sexual assault was reported and processed in accordance with PREA policies and procedures, also suggesting that they should be deemed exhausted for purposes of this litigation.  (Seguin Decl. Ex. N at 242, 249–251).

Based on the foregoing, plaintiff's claim against C.O. Baer relative to the alleged sexual assault that took place on March 29, 2018 should not be dismissed on the basis of plaintiff's failure to exhaust his administrative remedies.  *See Sheffer v. Fleury*, No. 9:18-CV-1180 (LEK/DJS), 2019 WL 4463672, at *5 (N.D.N.Y. Sept. 18, 2019) ("And because '[t]here appears to be no question that Plaintiff alleged to prison officials that he was the victim of a sexual assault . . . [Plaintiff's] report was [thus] documented as

required' and 'was sufficient to exhaust his administrative remedies.'") (citing *Medina v. Kaplan*, No. 16-CV-7223, 2018 WL 797330, at *5 (S.D.N.Y. Feb. 8, 2018)).

### b.    April 6, 2018 – C.O. Hunt

Plaintiff also alleges that defendant C.O. Hunt violated plaintiff's constitutional rights when he sexually assaulted plaintiff on April 6, 2018.  (SAC at 18).  The record does not contain any formal grievances filed with the IGP office relative to this claim.  However, on April 6, 2018, plaintiff prepared a correspondence to defendant Annucci in which, among other things, he reported that a John Doe correctional officer had "grabbed" plaintiff's buttocks during a pat-frisk, stating "If you haven't noticed we do what we want here."  (SAC Ex. A at 13).  Plaintiff penned several other complaints to Annucci in early April, including the allegation of sexual assault by defendant C.O. Baer.  (*See generally* SAC Ex. A).

On April 20, 2018, Deputy Commissioner and Chief of the Office of Special Investigations Stephen Maher responded to plaintiff in a letter stating:

> Governor Cuomo and Acting Commissioner Annucci have asked me to respond to your letter alleging sexual harassment at Clinton Correctional Facility.  This office has received your complaint and is investigating the allegation.

(*Id.* at 2).

On these facts, the moving defendants have failed to satisfy their initial burden of showing that plaintiff failed to adequately exhaust his administrative remedies as to the alleged sexual assault by C.O. Hunt on April 6, 2018.  Specifically, the moving defendants have failed to articulate why plaintiff's documented report to Annucci did

not satisfy his exhaustion requirements relative to allegations of sexual abuse under

DOCCS directive 4040 and the PREA, and summary judgment is therefore not

warranted on this basis.

### 4.    Remaining "Unfiled" Grievances

As previously discussed, while incarcerated at Clinton C.F. plaintiff filed a

grievance on December 3, 2018 (Grievance No. 74906-18), complaining that the IGRC

was refusing to process his grievances.  (Seguin Decl. Ex. P at 270).[15]  The IGRC

responded to Grievance No. 74906-18, concluding that plaintiff had 42 grievances on

file and that plaintiff's "complaints and correspondences are responded to

appropriately."  (*Id.* at 271).  Plaintiff appealed Grievance No. 74906-18 to the

superintendent on December 4, 2018, who responded to plaintiff's grievance on

December 10, 2018 and determined that plaintiff's grievances and appeals were

processed in accordance with DOCCS directives.  (*Id.* at 272).  Plaintiff appealed the

superintendent's determination to CORC on December 17, 2018, stating that the IGRC

had failed to file his grievances, and that the grievance supervisor was refusing to

process unfiled grievances he had brought to her attention.  (*Id.*).  Plaintiff's appeal was

received by the IGRC office on December 20, 2018.  (*Id.*).  CORC responded to

plaintiff's appeal on January 15, 2020, upholding the superintendent's determination.

---

[15]The evidence suggests that prior to submitting this formal grievance, plaintiff had corresponded with the IGP supervisor in an effort to determine why several of his grievances had not been processed.  (*See* Seguin Decl. Ex. P at 317 – June 14, 2018 correspondence from plaintiff to IGP supervisor identifying various grievances that were never returned to plaintiff with grievance numbers; *Id.* at 315 – June 15, 2018 correspondence from IGP supervisor to plaintiff identifying filed grievances, and directing plaintiff to submit any "missing" grievances per DOCCS policy; *Id.* at 285 – June 21, 2018 correspondence from plaintiff to IGP supervisor attaching copies of grievances that were not filed by Clinton C.F. staff "in retaliation," and requesting these grievances be filed).

(*Id.* at 267).

In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate in the context of grievances allegedly submitted to facility staff, but purportedly never filed. There, the plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a correctional officer to forward to the grievance office on his behalf. *Id.* at 120-21.  Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121.  He never received a response to his grievance and alleged that it was never filed by the officer to whom he had given it. It was undisputed the plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.*

"Following the Second Circuits decision in *Williams*, several courts have concluded that where a grievance is both *unfiled* and *unanswered*, the process to appeal . . . is prohibitively opaque, such that no inmate could actually make use of it." *Maldonado v. Mandalaywala*, No. 9:17-CV-1303 (BKS/TWD), 2020 WL 1159426, at *15 (N.D.N.Y. Feb. 12, 2020), *report and recommendation adopted*, 2020 WL

27

1157643 (N.D.N.Y. Mar. 10, 2020) (internal quotation marks omitted) (listing cases).

However, other courts have distinguished *Williams* from cases in which the plaintiff claimed to have filed a grievance where, *inter alia*, the inmate was not segregated from the population and had access to the grievance office. *Id.* at *16 (listing cases).  Notably, unsupported assertions that plaintiff "filed a grievance but that it was somehow lost or destroyed" have generally been found "insufficient to establish a genuine issue of fact." *See, e.g., Blake v. Porlier,* No. 9:18-CV-1008 (DNH/CFH), 2019 WL 7484052, at *5 (N.D.N.Y. Oct. 4, 2019) ("Courts within the Second Circuit have continuously held that 'mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations.'") (quoting *Rodriguez v. Cross*, No. 9:15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *5 (N.D.N.Y. May 9, 2017); *Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (finding remedies available where the plaintiff claimed officers misplaced his grievances, but offered no evidence to support his claim)); *Artis v. Dishaw*, No. 9:14-CV-1116 (MAD/ATB), 2016 WL 11266599, at *7 n.13 (N.D.N.Y. Sept. 12, 2016) (finding the plaintiff's failure to exhaust was not excusable, in part, because while the plaintiff "state[d] that some grievances were destroyed . . . he ha[d] not submitted any copies of these grievances, nor d[id] he specify when he attempted to file them"), *report-recommendation adopted,* 2017 WL 1076343 (N.D.N.Y. Mar. 22, 2019); *Engles v. Jones*, No. 6:13-CV-6461, 2018 WL 6832085, at *10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a

28

genuine issue of material fact.") (citing *Scott v. Kastner Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018)).

### a.    April 6, 2018 – C.O. Wood

Plaintiff alleges that defendant C.O. Wood violated his constitutional rights on April 6, 2018, when C.O. Wood denied plaintiff "chow and rec." (SAC at 10). In conjunction with filing Grievance No. 74906-18, plaintiff submitted a copy of a purportedly unfiled grievance dated April 6, 2018, in which plaintiff complains that a "John Doe" correctional officer denied him "chow and rec" in substantially the same manner as that described in plaintiff's second amended complaint. (*Compare* SAC at 10 *with* Seguin Decl. Ex. P at 307). However, a notation on the document indicates that it was "filed" as Grievance No. 73396-18. (*Id.*). Other documentation submitted by the moving defendants indicates that Grievance No. 73396-18 was filed (*see* Seguin Decl. Ex. P at 275), however it is not referred to by the moving defendants as a relevant grievance to plaintiff's federal claims, nor is the grievance itself included as an exhibit by the moving defendants. According to DOCCS's records, Grievance No. 73396-18 was never appealed to CORC. (Seguin Decl. Ex. B).

The fact that Grievance No. 73396-18 was never appealed to CORC would ordinarily compel this court to recommend dismissal for plaintiff's failure to exhaust his administrative remedies. However, plaintiff has alleged that the IGRC refused to process this grievance, and the moving defendants' failure to submit the documentation and history surrounding Grievance No. 73396-18 leaves a question of fact as to whether plaintiff's ability to exhaust his administrative remedies with respect to this claim was

obstructed.

Notwithstanding the material questions of fact remaining with respect to plaintiff's exhaustion of this claim, the court is ultimately recommending that plaintiff's April 6, 2018 cause of action against C.O. Wood be dismissed on the merits. (*See infra* at 37–42). Thus, even assuming, *arguendo*, that plaintiff had sufficiently exhausted this claim, summary judgment is warranted.

### b.    April 17, 2018 – C.O. Baer

Plaintiff alleges that C.O. Baer violated plaintiff's constitutional rights on April 17, 2018, when he "intentionally rammed his arm into plaintiff's testicles" in retaliation for plaintiff writing complaints. (SAC at 16). According to DOCCS records, plaintiff did not file, much less exhaust to the CORC level, any grievances complaining of a sexual assault occurring on April 17, 2018. (*See* Seguin Decl. Exs. B, P at 275). However, this incident was one of the several that plaintiff specifically identified to the IGP supervisor as having grieved, but never receiving a response. (Seguin Decl. Ex. P at 317–18). On June 15, 2018, the IGP supervisor responded to plaintiff's correspondence, confirming that there were "no grievances on file for [plaintiff] with written dates of . . . 4/17/18 (alleges sexual assault)[.]" (*Id.* at 315). The IGP supervisor directed plaintiff to submit his complaint within five days if it was "within the 21 day time frame" permitted by DOCCS regulations and directives. (*Id.*). Plaintiff was also advised that if his complaints were outside of the 21 day limit, he "may submit [his grievance] with proof of mitigating circumstances to the IGP office," but that "an exception to the time limit may not be granted more than 45 days after an alleged

30

occurrence." (*Id.*).  Although plaintiff responded to the IGP supervisor with copies of several grievances that were never filed (*Id.* at 281), there  is no evidence that plaintiff attempted to resubmit a grievance complaining of sexual assault on April 17, 2018 to the grievance office.  Moreover, the underlying incident occurred 59 days before the IGP supervisor's correspondence, thus based on his representations the grievance would under no circumstances be accepted for filing.  (*See generally* Seguin Decl. Ex. P).

On this record, the court finds that a question of fact remains as to whether plaintiff's administrative remedies were available to him with respect to this claim, especially considering that plaintiff's underlying complaint was one of sexual assault. "When questions of fact and issues of credibility exist regarding the failure to exhaust administrative remedies, a court should neither engage in fact finding nor make determinations as to credibility in addressing a defendant's motion for summary judgment for failure to exhaust." *Curtis v. Bola*, No. 9:15-CV-00718 (GLS/TWD), 2016 WL 7735755, at *9 (N.D.N.Y. Nov. 1, 2016), *report and recommendation adopted*, 2017 WL 120945 (N.D.N.Y. Jan. 12, 2017) (listing cases).  Accordingly, the court recommends that an evidentiary hearing on this claim be ordered by the district court, in which the exhaustion issue can be determined as a matter of law.

### c.    April 17, 2018 – C.O. Young

Plaintiff alleges that C.O. Young violated plaintiff's constitutional rights on April 17, 2018, when he denied plaintiff "chow and rec" in retaliation for plaintiff filing complaints.  (SAC at 11).

This is another claim that was never appealed to the CORC level, however is identified by plaintiff as having been submitted to DOCCS, but never processed. (*See* Seguin Decl. Ex. P at 318). The IGP supervisor confirmed that this grievance had not been filed as of June 15, 2018. (*Id.* at 315). Moreover, based on the IGP supervisor's representations plaintiff had no recourse to re-file this grievance with the grievance office as of the date of his response, because it had been more than 45 days since the alleged occurrence. (*Id.*).

Based on the aforementioned, a genuine question of fact exists as to whether plaintiff's administrative remedies were available to him with respect to this claim. Accordingly, the district court should deny summary judgment at this juncture and order an evidentiary hearing on this issue.

### 5. Defendants Annucci and Bell

Plaintiff's causes of action against defendants Annucci and Bell were interpreted by the court as "supervisory claims." (Dkt. No. 6 at 23–24). Liberally construed, plaintiff alleges that Annucci and Bell failed to take remedial action in response to the letters plaintiff sent them complaining about several of the underlying constitutional violations occurring at Clinton C.F. (SAC at 8–9, 19–21).

Even assuming, *arguendo*, that plaintiff sufficiently exhausted his administrative remedies against Annucci and Bell,[16] summary judgment is nevertheless warranted for

---

[16]*See Zappulla v. Annucci*, 636 Fed. App'x 824, 825 (2d Cir. 2016) (reversing the lower court award of summary judgment and dismissal of claims against Annucci based on a finding that the plaintiff failed adequately to exhaust administrative remedies because he did not specifically name Annucci in his administrative complaint); *see also Brownell v. Krom*, 446 F.3d 305, 311 (2d Cir. 2006) (reasoning that naming a defendant in a grievance is not necessary to give prison officials notice sufficient to resolve the grievance).

lack of personal involvement.  The Second Circuit recently clarified the standard for personal involvement of individuals in a § 1983 action. *See Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020).[17] Pursuant to the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit in *Tangreti* made clear that in order to attach liability to an individual, regardless of supervisory status, a plaintiff must

> plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676 . . . . "The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue" because the elements of different constitutional violations vary. *Id*. The violation must be established against the supervisory official directly.

*Id*. (quoting *Iqbal*, 556 U.S. at 676). Quoting a Tenth Circuit case, the *Tangreti* court stated that "'after *Iqbal,* [a p]laintiff can no longer succeed on a § 1983 claim against [a d]efendant by showing that as a supervisor he behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, unless that is the same state of mind required for the constitutional deprivation he alleges.'" *Id*. (alterations in original) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010) (internal quotation marks omitted) (emphasis added, other citations omitted). The supervisor must have committed the violation him or herself, not by the supervision of others who committed the violation.  *Id.*  Likewise, the supervisor must personally display the requisite state of mind, depending on the violation at issue. *Id.*

---

[17]The court's order on initial review of the claims against defendants Annucci and Bell was issued in 2019, before the Second Circuit had directly addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability.

Here, plaintiff's claims against Annucci and Bell fail under the *Tangreti* standards for personal involvement. It is undisputed that neither Annucci nor Bell were physically involved in the incidents at Clinton C.F. which give rise to plaintiff's complaint. Otherwise, plaintiff has not shown that Annucci and/or Bell violated his constitutional rights by their own conduct. For example, in order for plaintiff to attach liability to these defendants for a sexual assault by C.O. Baer, plaintiff must show that Annucci and/or Bell acted with deliberate indifference – meaning that they personally knew of and disregarded an excessive risk to plaintiff's health or safety. *See Tangreti*, 983 F.3d at 619 (citing *Whitson v. Stone Cty. Jail*, 602 F.3d 920, 928 (8th Cir. 2010) ("These defendants are thus liable only if they *personally displayed* deliberate indifference to the risk that [the inmate] would be assaulted.") (emphasis added)). However, plaintiff has failed to adduce any evidence supporting the inference that Annucci and/or Bell "knew of and disregarded a substantial risk of sexual abuse" to plaintiff. *Id.*

Instead, the crux of plaintiff's claims against Annucci and Bell is that they are liable for failing to sufficiently remedy the wrongs of their subordinates, despite having received notice from plaintiff of the alleged misconduct. These contentions closely track the pre-*Tangreti* standard for establishing personal involvement of a supervisory official; contemplating personal involvement where an official, after being informed of the violation through report or appeal, failed to remedy the wrong. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). However, in the wake of *Tangreti* these allegations are insufficient to establish personal involvement of a supervisory official,

and plaintiff has otherwise failed to allege facts plausibly suggesting Annucci and/or

Bell's personal involvement in the alleged conduct giving rise to plaintiff's First and

Eighth Amendment claims. *See Hendrix v. Annucci, et al.*, No. 9:20-CV-0743

(GTS/TWD), 2021 WL 4405977, at *14 (N.D.N.Y. Sept. 27, 2021) (finding no personal

involvement where plaintiff's theory of supervisory liability relied on the factors

outlined in *Colon*, and recognizing the new standard for establishing personal liability

under *Tangreti*). Accordingly, summary judgment should be granted to defendants

Annucci and Bell.

## IV.   **First Amendment Free Exercise Claims**

### A.   **Legal Standards**

Inmates have the right under the First and Fourteenth Amendments to freely

exercise a chosen religion. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing

*Pell v. Procunier*, 417 U.S. 817, 822 (1974)). However this right is not limitless, and

may be subject to restrictions relating to legitimate penological concerns. *Benjamin v.*

*Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). The analysis of a free exercise claim is

governed by the framework set forth in *O'Lone v. Estate of Shabazz*, 482 U.S. 342

(1987) and *Turner v. Safley*, 482 U.S. 78, 84 (1987). This framework is one of

reasonableness and is less restrictive than the standard ordinarily applied to the alleged

infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588.

In *O'Lone*, the Supreme Court held that a regulation that burdens a protected

right withstands a constitutional challenge if that regulation is reasonably related to

legitimate penological interests. 482 U.S. at 349 (quoting *Turner*, 482 U.S. at 89). An

individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord*, 467 F.3d 263, 274 n.4 (2d Cir. 2006) (citations omitted).  In *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The Second Circuit has examined the standard for analyzing a First Amendment religion claim.  *Holland v. Goord*, 758 F.3d 215, 220-22 (2d Cir. 2014).  In *Holland*, the court discussed the degree of burden required for a First Amendment claim.  *Id.* at 220-21.  The court noted that it has not been decided in this Circuit whether, to state a claim under the First Amendment, the inmate must show at the onset that the disputed conduct "substantially burdens his sincerely held religious beliefs." *Id.* (citing *Salahuddin, supra* at 274-75; *Ford*, *supra* at 592 (where the court assumed without deciding that the substantial burden test applies)).  The court in *Holland* did not decide the issue, rather the court assumed the continued validity of the substantial burden test and analyzed the case accordingly.[18]  *Id.*  This court will follow the analysis in *Holland* and proceed to consider the First Amendment analysis, assuming that the substantial burden test is still valid.  *See also Williams v. Does*, 639 F. App'x 55, 56 (2d Cir. 2016)

---

[18]This finding was supported by the fact that the court's "precedent squarely dictat[ed] that Holland's religious exercise was unconstitutionally burdened," a point that the defendants in that case did not challenge on appeal.  *Holland*, 758 F.3d at 221.

(discussing the unsettled status of the substantial burden test).

Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett*, No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin*, 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford*, 352 F.3d at 595.

### B.    Analysis

Defendants C.O. Wood, and C.O. Dubrey[19] alternatively seek summary judgment dismissing plaintiff's first amendment free exercise claims on the merits. Specifically, these defendants argue that they did not "substantially burden" plaintiff's sincerely held religious beliefs. (Def.'s MOL at 15–16). Plaintiff contends that the removal of his crown, and the denial of his privileges constituted a substantial burden, thus summary judgment should be denied. (Pl.'s MOL at 18).

Because this court is recommending the dismissal of plaintiff's free exercise claim against C.O. Dubrey on exhaustion grounds, we need not reach the merits of that

---

[19]Defense counsel also argues that plaintiff has failed to state a free exercise claim against C.O. Baer. (Def.'s MOL at 15). This argument is moot, as there is no surviving First Amendment free exercise claim against C.O. Baer pursuant to Judge McAvoy's April 23, 2019 order on initial review. (Dkt. No. 41 at 31–32).

37

claim. (*See supra* at 19–20). As for C.O. Wood, plaintiff alleges that the defendant correctional officer denied him "chow and rec" because plaintiff had "misinterpreted the directive" regulating plaintiff's permissible hair length and style. (SAC at 10). Plaintiff identifies his religion as Rastafarian. (Pl.'s Dep. at 10–11). "It is well-settled in this Circuit that '[t]he crown is worn as a Rastafarian tradition, to keep impurities from the dreadlocks, to shield them from the eyes of non-Rastafarians, and to keep the curious from touching them.'" *Bryant v. Miller*, No. 9:18-CV-494 (GTS/CFH), 2019 WL 5273210, at *9 (N.D.N.Y. June 18, 2019), *report and recommendation adopted*, 2019 WL 4267376 (N.D.N.Y. Sept. 10, 2019) (quoting *Benjamin v. Coughlin*, 708 F. Supp. 570, 574 (S.D.N.Y. 1989), *aff'd* 905 F.2d 571 (2d Cir. 1990)). "[T]he religious exemption to [DOCCS] Directive 4914 that allows for Rastafarian inmates to wear their dreadlocks in an approved religious head covering . . . was apparently intended to accommodate inmates' religious rights, while still taking account of genuine and serious security needs." *Id*. (quoting *Barnes v. Fedele*, 337 F. Supp. 3d 227, 234 (W.D.N.Y. 2018) (internal quotation marks omitted).

According to plaintiff's allegations, on the morning of April 6, 2018 he had a disagreement with defendant C.O. Doe #3 about whether plaintiff was wearing his hair and crown in compliance with DOCCS Directive 4914. (Pl.'s Dep. at 22–23). Plaintiff informed C.O. Doe #3 that he had "misinterpreted" the directive. (*Id.*). In response, C.O. Doe #3 stated that "every time he sees [plaintiff] with [his] crown on [C.O. Doe #3 was] going to deny [plaintiff] chow and rec." (SAC at 10).

At approximately 11:15 a.m., C.O. Wood was preparing the list of inmates who

would be attending "chow" for lunch.  (Pl.'s Dep. at 24–25).  When C.O. Wood walked by plaintiff's cell,[20] he stopped and stated, "It states on here don't let you out because you misinterpreted the record."[21]  (*Id.* at 28).  Plaintiff did not attend "chow" or "rec" that day.  (*Id.* at 31).

Plaintiff's allegations fail to rise to the level of a First Amendment violation against C.O. Wood.  Construing the facts in the light most favorable to plaintiff, it is undisputed that C.O. Wood's determination that plaintiff not be let out of his cell for "chow" or "rec" that afternoon was based on the correctional officer's contemporaneous review of a list indicating that plaintiff was in violation of a DOCCS directive.  Plaintiff does not allege that C.O. Wood was present for, or knew about, C.O. Doe #3's earlier interaction with plaintiff.  Nor does plaintiff contend that C.O. Wood referred to plaintiff's religion, hairstyle, or crown when informing him that he was not permitted to leave his cell.  During his deposition plaintiff testified that inmates have the option to either attend a meal, or stay in their cell.  (*Id.* at 29).  Plaintiff also conceded that the officers regularly prepared a list of who was permitted to leave their cells to attend meals for "security reasons."  (Pl.'s Dep. at 25).

The law is well established that "a generally applicable policy will not be held to violate a [prisoner's] right to free exercise of religion if that policy 'is reasonably related to legitimate penological interests.'" *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir.

---

[20]Clinton C.F. is a maximum security facility, and according to plaintiff the inmates remain in their cells "all day" unless they are called out for a specific activity.  (Pl.'s Dep. at 26–28).

[21]In his SAC, plaintiff quotes C.O. Wood as saying "you misinterpreted the *directive.*" (SAC at 10).

2010) (quoting *O'Lone*, 482 U.S. 349); *see also Turner*, 482 U.S. at 89. "This approach

ensures the ability of corrections officials to anticipate security problems and to adopt

innovative solutions to the intractable problems of prison administration, and avoids

unnecessary intrusion of the judiciary into problems particularly ill suited to resolution

by decree." *O'Lone*, 482 U.S. at 349-50 (internal citation and quotation marks omitted).

Once a plaintiff has satisfied the threshold showing of a substantial burden of his

sincerely held religious beliefs, "[t]he defendants then bear the relatively limited burden

of identifying the legitimate penological interests that justify the impinging conduct."

*Salahuddin,* 467 F.3d at 275. Once defendants carry this burden of production, "the

burden remains with the prisoner to show that these articulated concerns were

irrational." *Id*. (internal quotation marks and modifications omitted); *see also Overton*

*v. Bazzetta*, 539 U.S. 126, 132 (2003) (observing that burden "is not on the State to

prove the validity of prison regulations but on the prisoner to disprove it").

Plaintiff's free-exercise claim against C.O. Wood fails at the third step of the

analysis.  Plaintiff does not dispute that the correctional officers regularly determine

who can and will leave their cells for meals for security purposes, and that C.O. Wood's

determination to keep plaintiff in his cell was based on this policy and the notes

provided to him that plaintiff had violated a DOCCS directive.  Nor has plaintiff shown

that C.O. Wood's security concerns in keeping prisoner's who are documented to be in

violation of DOCCS directives in their cell was otherwise "irrational."  Thus, summary

judgment is warranted in favor of C.O. Wood because there are no genuine issues of

material fact that the restriction imposed on plaintiff was not reasonably related to a

legitimate penological interest.

Though not raised by the defendants,[22] the court alternatively finds that C.O. Wood is entitled to summary judgment on the grounds of qualified immunity. Qualified immunity provides a "shield[ ] ... from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct . . . . To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and citations omitted). A defendant will thus not be liable for damages "if he did not violate clearly established law or if it was objectively reasonable for him to believe that he was not violating clearly established law." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (citing *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) and *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir.2001)). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 278 (2d Cir.1999); *see also Nicholas v. Miller*, 189 F.3d 191, 195 (2d Cir. 1999) ("'[T]he inquiry is not whether plaintiff has alleged a violation of an abstract legal standard, but whether under the particular circumstances alleged, defendants could have reasonably

---

[22]*See Dowling v. Barkman*, 2019 WL 7971868, at *3 (N.D.N.Y. Dec. 20, 2019), *report and recommendation adopted,* 2020 WL 103480 (N.D.N.Y. Jan. 8, 2020) ("In an appropriate case, the Court may raise qualified immunity sua sponte in considering a summary judgment motion."); *Doyle v. Coombe*, 976 F. Supp. 183, 187 (W.D.N.Y. 1997) (noting court's "inherent power to grant summary judgment sua sponte, in part, based upon the defense of qualified immunity.").

believed that they did not violate plaintiff's constitutional rights.'") (quoting *Gittens v. Lefevre*, 891 F.2d 38, 42 (2d Cir.1989)).

Here, although it was clearly established at the time of the alleged violation that prison officials may not substantially burden the right of free exercise without some justification, "it was not clearly established that security. . . concerns could not provide that justification for prisoners who had not demonstrated observance of their professed religion in a manner" identified by the prison's standards for that religion. *Hall v. Ekpe*, 408 F. App'x 385, 388 n. 3 (2d Cir. 2010) (modifications to original) (other citations omitted). Thus, to the extent that C.O. Wood relied on the security concern presented by plaintiff's documented failure to comply with a DOCCS directive as justification for denying his request to attend "chow," and even assuming C.O. Wood knew that the directive in dispute concerned plaintiff's ability to practice his religion, qualified immunity is warranted.

## V.    **Plaintiff's Motion to Amend**

### A.    **Legal Standard**

Under Federal Rule of Civil Procedure 15(a)(2), the Court "should freely give leave [to amend] when justice so requires." Courts follow "the same standard of liberality afforded to motions to amend under [FRCP] Rule 15" in deciding whether to allow joinder. *Robledo v. Number 9 Parfume Leasehold*, No. 12 Civ. 3579, 2013 WL 1718917, at *3 (S.D.N.Y. Apr. 9, 2013) (internal quotation marks and citation omitted). Notwithstanding this ordinarily lenient standard, the "denial of leave to amend has long been held proper" for reasons such as "undue delay, bad faith, dilatory motive, and

futility." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 200 (2d Cir. 2007).

However, "if the motion [to amend the complaint] is filed after the deadline imposed by the district court in its scheduling order," plaintiff must show "good cause" for its failure to timely amend. *Werking v. Andrews*, 526 F. App'x 94, 96 (2d Cir. 2013) (citing FRCP 16(b)(4)). "Whether good cause exists turns on the diligence of the moving party." *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (quotation marks and citation omitted), Thus, in order to demonstrate good cause, plaintiff must demonstrate that, "despite his having exercised diligence, the applicable deadline could not have been reasonably met." *Saloman v. Adderley Indus., Inc*., 960 F. Supp. 2d 502, 507 (S.D.N.Y. 2013). "Conversely, a movant fails to satisfy this burden when the proposed amendment is based on information the party knew or should have known in advance of the applicable deadline." *Id.* If plaintiff demonstrates good cause under FRCP 16, the Rule 15 standard applies to determine whether leave to amend should be granted. *Beckett v. Incorporated Village of Freeport*, No. 11-CV-2163, 2014 WL 1330557, at *5 (E.D.N.Y. Mar. 31, 2014).

"[A] plaintiff's pro se status does not relieve him of compliance with Rule 16(b)'s diligence requirement." *Tripathy, v. Lockwood*, No. 19-CV-6614, 2021 WL 5311029, at *3 (W.D.N.Y. Sept. 29, 2021), *report and recommendation adopted*, 2021 WL 5309790 (W.D.N.Y. Nov. 15, 2021) (citing *Li v. Morrisville State Coll.*, No.

07-CV-1302(LEK/GHL), 2010 WL 2735711, at *4 n.5 (N.D.N.Y. July 9, 2010) ("[t]his [c]ourt affords pro se litigants special solicitude[;] . . . [n]evertheless, a litigant's 'pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law' ") (other citations omitted).

### B.    Proposed Third Amended Complaint

Plaintiff's proposed third amended complaint (Dkt. No. 104-1)("TAC") is, in large part, the same as his second amended complaint, with some exceptions.  First, plaintiff has withdrawn the Third, Fifth, Twelfth, and Fourteenth causes of action in his second amended complaint, which are not referenced in the proposed third amended complaint.  (*See generally* TAC).  Second, the plaintiff has identified the Doe defendants in the proposed third amended complaint, with the exception of one remaining unnamed defendant.  (*Compare* SAC at 8–22 *with* TAC at 8–23).  Thus, C.O. Myatt, C.O. Allen, Sgt. LeClair, C.O. Yelle, C.O. Whitehurst, and C.O. Rowe appear as newly identified defendants.

Plaintiff also appears to reassert certain claims which were previously dismissed by Judge McAvoy on initial review, including plaintiff's (1) Eighth Amendment excessive force claim against C.O. Dubrey based on events that occurred on July 18, 2018 (*Compare* SAC at 14 *with* TAC at 14–15; *see* Dkt. No. 22 at 15–26); (2) First Amendment retaliation claim against Sgt. Burgess based on events that occurred on March 4, 2019 (*Compare* SAC at 22–23 *with* TAC at 22–23; *see* Dkt. No. 41 at 17–18); and (3) claims arising out of the alleged events that occurred on April 9, 2019 (*Compare* SAC at 27–28 *with* TAC at 24; *see* Dkt. No. 41 at 18–20).

44

## C.    Analysis

Plaintiff filed his original complaint on November 13, 2018.  (Dkt. No. 1). In the year that followed, plaintiff filed an amended complaint, which was accepted for filing on April 23, 2019 (Dkt. No. 22), and then a second amended complaint, which was accepted for filing and became the operative pleading as of October 18, 2019.  (Dkt. No. 41).  A pretrial discovery and scheduling order was issued on January 9, 2020, setting a deadline to amend the pleadings and join parties for May 8, 2020, and a discovery deadline for July 9, 2020.  (Dkt. No. 51).  The parties sought numerous extensions of these deadlines, which were granted by the court.  (Dkt. Nos. 55, 56, 66, 67, 68, 69, 72, 73).  The deadline to amend pleadings and for joinder of parties expired on July 7, 2020.  (Dkt. No. 56).  The extended discovery deadline expired on December 18, 2020. (Dkt. No. 73).  Plaintiff subsequently filed a gaggle of requests to reopen discovery, which were denied by this court on the basis that plaintiff had a sufficient opportunity to conduct discovery and to file any appropriate discovery motions. (Dkt. Nos. 76, 77, 78, 79, 80, 81, 86, 87, 102, 103, 105, 106).  I also noted that plaintiff failed to state any good cause for the substantial delay in seeking to reopen discovery. (Dkt. Nos. 103, 106).

Plaintiff filed the pending motion to amend his second amended complaint on November 8, 2021, over a year after the deadline to amend pleadings had passed and eleven months after the expiration of the extended discovery deadline. (Dkt. No. 104). Notably, the motion to amend was filed six months after the moving defendants' dispositive motion was fully briefed, in response to which plaintiff filed a memorandum

of law in opposition – arguing both exhaustion issues and the merits of his claims. (Dkt. Nos. 88, 100).

The district court should deny plaintiff's motion to amend and reject the proposed third amended complaint for the following reasons.  First, plaintiff has failed to comply with the local rules, which require a motion to amend to "set forth specifically the proposed insertions and deletions of language and identify the amendments in the proposed pleading, either through the submission of a redline/strikeout version of the pleading sought to be amended or through other equivalent means." N.D.N.Y. L.R. 15.1(a)(4).  Here, plaintiff made alterations to his third amended complaint without specifically identifying them, despite his representation that he "amended his complaint to reflect the [deficiencies] in the original complaint."  (Dkt. No. 104 at 2).

Second, plaintiff has not demonstrated, or even alleged, good cause to allow an amendment long after the court extended deadlines under Fed. R. Civ. P. 16 had passed. Plaintiff merely represents that the court should "grant leave freely to amend" his complaint.  (Id.).  In doing so, plaintiff has cited the standard for amending pleadings under Fed. R. Civ. P. 15(a), and disregards the threshold determination of good cause that he must establish for his delayed filing.  Throughout this litigation, plaintiff has argued that he was unable to meet motion and discovery deadlines because of the COVID-19 epidemic, his limited knowledge of the law, his learning disabilities and mental health issues, and problems with access to his legal materials and the law library.  This court has already determined that plaintiff's assertions to this extent are

"utterly incredible," given plaintiff's aggressive and ongoing participation in this litigation. (Dkt. No. 106). Otherwise, plaintiff has not included any facts in his moving papers that would demonstrate the good cause required to permit the amendments he seeks. *See Smith v. New York City Dept. of Educ.*, 524 Fed. App'x 730, 733 (2d Cir. 2013) (affirming district court's denial of pro se plaintiff's motion to amend where plaintiff sought to amend complaint six months after deadline for amended pleadings and failed to demonstrate good cause for the delay); *Buckingham v. Lewis General Tires, Inc.*, No. 13-CV-6242W, 2017 WL 975942, *3 (W.D.N.Y. Mar. 14, 2017) (denying pro se plaintiff's motion seeking leave to amend where plaintiff failed to demonstrate good cause for filing the motion after the deadline to amend the pleadings expired); *Yates v. Cunningham*, No. 08-CV-6346, 2012 WL 4473260, *3 (W.D.N.Y. Sept. 7, 2012) (denying pro se plaintiff leave to amend for failure to demonstrate diligence; "[plaintiff] has proffered no explanation for his failure to seek to add . . . a defendant until more than a year after the deadline for amending the pleadings had expired and after he had obtained the discovery necessary to learning [sic] [the proposed defendant's] identity"), *report and recommendation adopted*, 2012 WL 4473257 (W.D.N.Y. Sept. 26, 2012).

Third, it is evident that plaintiff has known of the facts and bases underlying the amendments he now seeks leave to make, and planned to file another motion to amend, for almost a year. In the context of discussing the various John Doe defendants at his December 15, 2020 deposition, plaintiff was asked if he was still unaware of the identity of John Doe #3. In response, plaintiff stated,

47

> I looked at the logbook. I'm in the process of amending –
> possibly submitting an amended complaint because I got – I got
> his name from the log book that was provided in discovery.

(Pl.'s Dep. at 24). When asked, plaintiff represented that he would "definitely" be filing the motion to amend his complaint "before the end of [the] week." (*Id.* at 104). Plaintiff did not actually file his motion until almost a year later. On these facts, plaintiff's lack of diligence in pursuing his motion to amend is clear. *See Werking v. Andrews*, 526 F. App'x 94, 96 (2d Cir. 2013) (denying the plaintiff's motion to amend and noting the plaintiff's lack of diligence where, "despite having sufficient notice of the relevant facts by April, [the plaintiff] inexplicably failed to file his motion to amend for another two months," during which time "the parties completed discovery and the defendants moved for summary judgment").

Plaintiff's motion to amend should be denied even under the more lenient standard set forth in Rule 15. Having already addressed the issue of undue delay, the untimely amendments posed by plaintiff would also cause undue prejudice to the defendants. Where, as here, discovery has already been completed and the non-movant has filed a dispositive motion, the Second Circuit has held that a proposed amendment to pleadings is "especially prejudicial." *Krumme v. WestPoint Stevens, Inc.*, 143 F.3d 71, 88 (2d Cir. 1998) (affirming denial of motion for leave to amend when the case was "near resolution and discovery had been completed"). In fact, "[t]here are numerous instances in which motions for leave to amend were denied because discovery had already been completed and post-discovery motions for summary judgment had been submitted." *Kenney v. Clay*, 172 F. Supp. 3d 628, 643 (citing *Cresswell v. Sullivan &*

*Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990) (affirming denial of motion for leave to amend where discovery had closed and the plaintiff offered no valid excuse for delay)); *see also CL-Alexanders Laing & Cruickshank v. Goldfeld*, 739 F. Supp. 158, 166 (S.D.N.Y. 1990) (denying motion for leave to amend six months after the close of discovery and after the submission of the defendant's post-discovery motion for summary judgment).

Plaintiff's amendments are also, for several reasons, futile. In his proposed third amended complaint, plaintiff reasserts previously dismissed claims against Sgt. Burgess, C.O. Mahan, and C.O. Darcel, the factual allegations of which are overwhelmingly identical to those asserted in the second amended complaint.[23] (*Compare* SAC at 22–23, 27–28 *with* TAC at 22–23, 24). For the same reasons set forth in the order on initial review which specifically analyzed these claims (Dkt No. 41 at 17–20), plaintiff's allegations against these defendants are insufficient to state a claim upon which relief may be granted, thus plaintiff's motion to amend should be denied as futile. *See Lucente v. Int'l Business Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (An amendment is futile if the proposed claim could not survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure).

Finally, at the time plaintiff filed his motion to amend on November 8, 2021, the statute of limitations may have expired on at least some of the surviving causes of

---

[23]The primary difference being that plaintiff identified the Doe defendants in his proposed third amended complaint.

action which this court is recommending should proceed past summary judgment.[24]  *See Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) (holding statute of limitations applicable to claims brought in New York under § 1983 is three years). In general, a plaintiff may proceed against a placeholder defendant, so long as he replaces the John Doe with a named party within the applicable statute of limitations period. *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 468-69 (2d Cir. 1995). Thus, "[a]s a practical matter, a plaintiff who fails to identify John Doe defendants within the statute of limitations risks losing the opportunity to sue those defendants." *Green v. Walsh*, No. 9:05-CV-00327 (TJM/DEP), 2008 WL 4517975, at *6 n.8 (N.D.N.Y. Sept. 29, 2008) (citing *Barrow*, 66 F.3d at 469).

Here, the majority of events giving rise to plaintiff's surviving causes of action took place in March through August of 2018.  However, plaintiff did not attempt to replace the Doe defendants until November 8, 2021, months after the limitations period would have expired, absent some basis for tolling.[25]  "While 'John Doe' pleadings

---

[24]The three year statute of limitations has not expired on plaintiff's claim against C.O. Doe #8 based on the alleged events that occurred on March 4, 2019, however this court has already concluded that plaintiff failed to exhaust administrative remedies with respect to this incident, which also involved moving defendant C.O. Mahan.  (*See supra* at 18–20).

[25]Given his lack of diligence in moving to amend, it is unlikely that the plaintiff could meet his burden of establishing equitable tolling of the statute of limitations.  *See Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 232 (N.D.N.Y. 2009) ("[W]hen the allegations of the complaint make clear that the claim is barred by the limitations period, the plaintiff has the burden of establishing a basis to toll the applicable statute.") (quoting *Eickhorst v. E.F. Hutton Group, Inc.*, 763 F. Supp. 1196, 1202 (S.D.N.Y. 1990)).  However, plaintiff's active pursuit of grievances may have tolled the statute of limitations on some of his surviving claims against John Doe defendants for long enough to bring them within the statute of limitations as of November 8, 2021. *See Gonzalez v. Hasty*, 651 F.3d 318, 323-24 (2d Cir. 2011) (the statute of limitations for an inmate's section 1983 claim must be tolled while the inmate is actively exhausting his administrative remedies).  Given the complicated history of plaintiff's efforts to exhaust his administrative remedies with respect to his various surviving claims, and the fact that futility of some or all of those claims on statute-of-limitations grounds is an alternative basis for

cannot be used to circumvent statute of limitations, a plaintiff who finds that the limitations period on his claim has run may still seek to amend his complaint to add additional defendants, but he will be bound by the requirement that the proposed amendment 'relate back' to the date that the original complaint was filed." *Kavanaugh v. Village of Green Island*, No. 8:14-CV-01244 (BKS/DJS), 2016 WL 7495813, at *3 (N.D.N.Y. Dec. 30, 2016) (internal citation and quotation marks omitted).

In this case, however, plaintiff cannot satisfy any of the applicable standards necessary in order to relate his proposed third amended complaint back to the original pleading.  Under Rule 15(c)(1)(C) of the Federal Rules of Civil Procedure, the following conditions must be met for a later amendment to a pleading to relate back to the date of the original pleading:

> (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, but for a mistake of identity, the original action would have been brought against it; and ... (4) the second and third criteria are fulfilled within 120 days of the filing of the original complaint, and ... the original complaint [was] filed within the limitations period.

*Barrow*, 66 F.3d at 468-69 (citing Fed. R. Civ. P. 15(c)(1)(C)). However, the Second Circuit has held that Rule 15(c)(1)(C) "does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities," since "the failure to identify individual defendants when the plaintiff knows that such defendants must be named

---

denying the motion to amend, the court will not engage in a torturous analysis of possible tolling.

cannot be characterized as a mistake." *Id*. at 470. Thus, Plaintiff cannot satisfy the requirements for relation back under Rule 15(c)(1)(C). *See Scott v. Village of Spring Valley*, 577 F. App'x 81, 83 (2d Cir. 2014) ("[W]e have consistently held that 'the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake.'") (quoting *Hogan v. Fischer*, 738 F.3d 509, 517-18 (2d Cir. 2013)).

Alternatively, an amended pleading identifying John Doe defendants may still relate back under Rule 15(c)(1)(A) of the Federal Rules of Civil Procedure, via § 1024 of the New York Civil Practice Law and Rules, which states:

> A party who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party, may proceed against such person as an unknown party by designating so much of his name and identity as is known. If the name or remainder of the name becomes known all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly.

N.Y. C.P.L.R. § 1024. A plaintiff must meet two requirements for relation back under § 1024: (1) he must exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name; and (2) he must describe the John Doe party in such form as will fairly apprise the party that he is the intended defendant. *Hogan*, 738 F.3d at 519 (internal quotations and citations omitted). "Due diligence in this context requires that a plaintiff show that he or she made timely efforts to identify the correct party before the statute of limitations expired." *Ceara v. Deacon,* 68 F. Supp. 3d 402, 409 (S.D.N.Y. 2014) (quotations omitted).

For the reasons previously discussed, this plaintiff cannot satisfy the due

52

diligence requirement because he failed to make a timely effort to identify the correct parties, and file his amended pleading, before the statute of limitations expired. *Strada v. City of New York*, No. 11-CV-5735, 2014 WL 3490306, at *6 (E.D.N.Y. July 11, 2014) (refusing to find that the plaintiff acted with due diligence under § 1024 because, among other things, when the defendants provided the plaintiff with the names of the officers involved in the plaintiff's arrest prior to the expiration of the statute of limitations, the plaintiff did not attempt to amend the complaint).

In light of the foregoing, plaintiff's motion to amend is untimely, prejudicial, and futile, at least in part; indeed it fails to satisfy any of the relevant standards allowing for such relief. Accordingly, the district court should deny plaintiff's motion to amend, and the second amended complaint should remain the operative pleading.

## VI. <u>Sua Sponte Dismissal of Doe Defendants</u>

Plaintiff had a duty to diligently litigate his claims against the Doe defendants, including a specific duty to identify, name, and serve them. See Fed. R. Civ. P. 41(b); L.R. 41.2(a); Fed. R. Civ. P. 4(m); Fed. R. Civ. P. 16(f). As discussed above, plaintiff has failed to fulfill that duty and has not shown good cause excusing that failure. Dismissal of a claim under Rule 41(b) for failure to prosecute is appropriate "where discovery has closed and the plaintiff has had ample time and opportunity to identify and serve John Doe defendants" but has failed to do so. *Jones v. Rock*, No. 12-CV-0447, 2015 WL 791547, at *21 (N.D.N.Y. Feb. 24, 2015) (quotation marks and alteration omitted); *Le Sane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001) (Rule 41(b) "gives the district court authority to dismiss a plaintiff's case sua

sponte for failure to prosecute"); *Delrosario v. City of N.Y.*, No. 07-CV-2027, 2010 WL 882990, at * 5 (S.D.N.Y. Mar. 4, 2010) (sua sponte dismissing claims against John Doe Defendants for failure to prosecute "[w]here discovery was closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants").

In determining whether such dismissal is appropriate, the court should consider (1) the duration of the delay occasioned by the plaintiff's conduct, (2) whether the plaintiff has received notice that further delay would result in dismissal, (3) whether the defendant is likely to be prejudiced by further delay, (4) the plaintiff's right to due process, and (5) the efficacy of lesser sanctions. *Lucas v. Miller*, 84 F.3d 532, 535 (2d Cir. 1996); *Davis v. Citibank, N.A.*, 607 F. App'x 93, 94 (2d Cir. 2015). No one factor is dispositive. *See Martens v. Thomann*, 273 F.3d 159, 180 (2d Cir. 2001). However, with regards to pro se litigants, Rule 41(b) dismissal "remains a harsh remedy to be utilized only in extreme circumstances," and pro se plaintiffs "should be granted special leniency regarding procedural matters." *LeSane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001) (citation omitted).

Here, notwithstanding plaintiff's pro se status, the court finds several factors weighing in favor of dismissal of plaintiff's John Doe claims. As early as March 2018, the plaintiff was advised by the court that:

> Upon learning the identity of a "Doe" defendant, plaintiff must amend his complaint to properly name him or her as a defendant. If plaintiff fails to ascertain the identity of any "Doe" defendant so as to permit the timely service of process, this action will be dismissed without prejudice as against that individual.

(3/6/2018 Text Order) (Dkt. No. 15).[26]  Plaintiff has displayed a complete disregard of that warning during the almost year-long delay in naming the Doe defendants, despite having known their identities.  The individuals designated as the Doe defendants have been prejudiced by this failure, and the court has considered and found no sanction less drastic than dismissal is appropriate.  Moreover, as discussed above the statute of limitations has likely expired on the surviving claims against the Doe defendants.

Accordingly, the district court should sua sponte dismiss plaintiff's claims against the Doe defendants for failure to prosecute. *See Hyatt v. LaValley*, No. 9:16-CV-00528 (TJM/TWD), 2018 WL 4473389, at *12 (N.D.N.Y. Aug. 2, 2018), *report and recommendation adopted*, 2018 WL 4471626 (N.D.N.Y. Sept. 18, 2018) (sua sponte dismissing the complaint against the Doe defendants for failure to diligently litigate, after considering and denying plaintiff's belated motion to amend for purposes of identify said individuals).

## CONCLUSION

If the court adopts this recommendation, the remaining causes of action would be: (1) plaintiff's Eighth Amendment claim against defendant C.O. Baer based on the alleged events that occurred on March 29, 2018; (2) plaintiff's Eighth Amendment claim against defendant C.O. Hunt based on the alleged events that occurred on April 6, 2018; (3) plaintiff's First and Eighth Amendment claims against defendant C.O. Baer based on the alleged events that occurred on April 17, 2018; and (4) plaintiff's First

---

[26]*See also* 10/18/2019 Decision and Order at 30-31, Dkt. No. 41 ("Plaintiff is . . . reminded, once again, that it is his obligation to take the necessary steps to ascertain the identities of the 'Doe' defendants who remain in this action.")

Amendment claim against defendant C.O. Young based on the alleged events that occurred on April 17, 2018. The claims against C.O. Baer and C.O. Young relating to the events of April 17, 2018, would be subject to survival pending an evidentiary hearing to determine whether plaintiff's administrative remedies were unavailable as a matter of law.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the motion for summary judgment filed by defendants Hunt, Baer, Dubrey, Bell, Annucci, Holland, Young, Mahan, and Wood (Dkt. No. 88) be **GRANTED IN PART and DENIED IN PART**, as explained above, and it is

**RECOMMENDED**, that the defendants' motion for summary judgment (Dkt. No. 88) be **DENIED** as to (1) plaintiff's Eighth Amendment claim against defendant Baer based on the alleged events that occurred on March 29, 2018; (2) plaintiff's Eighth Amendment claim against defendant Hunt based on the alleged events that occurred on April 6, 2018; (3) plaintiff's First and Eighth Amendment claims against defendant Baer based on the alleged events that occurred on April 17, 2018; and (4) plaintiff's First Amendment claim against defendant Young based on the alleged events that occurred on April 17, 2018; and it is

**RECOMMENDED**, that the motion for summary judgment (Dkt. No. 88) be **GRANTED** in all other respects, including **DISMISSAL** of the remaining claims against the moving defendants contained in the second amended complaint; and it is

**RECOMMENDED**, that the district court schedule an evidentiary hearing on the issue of exhaustion of administrative remedies with respect to (1) plaintiff's First

and Eighth Amendment claims against defendant Baer based on the alleged events that occurred on April 17, 2018; and (2) plaintiff's First Amendment claim against defendant Young based on the alleged events that occurred on April 17, 2018, and it is

**RECOMMENDED**, that plaintiff's motion to amend (Dkt. No. 104) be **DENIED**; and it is

**RECOMMENDED**, that the plaintiff's remaining claims against the John Doe defendants be sua sponte **DISMISSED with prejudice** for failure to diligently prosecute.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: November 30, 2021

Andrew T. Baxter
U.S. Magistrate Judge